Mayson Manufacturing Company, a corporation organized and existing by virtue of and under the Laws of the State of Michigan v. Commissioner.
Mayson Mfg. Co. v. Commissioner
Docket No. 14144.
United States Tax Court
1948 Tax Ct. Memo LEXIS 39; 7 T.C.M. (CCH) 849; T.C.M. (RIA) 48242; November 16, 1948
*39 Upon the facts, held, respondent did not err in disallowing in part compensation paid to three of petitioner's officers during the taxable year 1943. Edward A. Smith, Esq., 2262 National Bank Bldg., Detroit, Mich., for the petitioner. Cecil H. Haas, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: The respondent determined deficiencies in petitioner's declared value excess-profits tax and excess profits tax for the calendar year 1943 in the respective amounts of $2,460.40 and $31,899.14. The sole question presented is whether respondent erred in disallowing part of the deductions taken by petitioner during the year 1943 for compensation paid to its three officers. The tax return for the year involved was filed with the collector of internal revenue for the district of Michigan at Detroit. Findings of Fact Petitioner is a Michigan corporation organized on July 1, 1929. Its principal office and plant are located in Detroit, Michigan. It was organized by Frank L. Wurl, Edward M. May and Lynn L. Hosier. Wurl died in 1936. May and Hosier, together with Otto Peterson, who joined petitioner in 1932 and who became an officer in 1936, continued to serve *40 as executives for petitioner through the year in question. Petitioner's original board of directors was composed of Wurl, May and Hosier. Peterson became a director in 1936 when Wurl died. May, Hosier and Peterson continued to be petitioner's directors from that date through the year in question. The stockholders and number of shares of petitioner owned by each from July 1, 1929 through 1943 were as follows: Stockholders
Shares
Par Value
July 1, 1929
Frank L. Wurl
401
Edward M. May
300
Lynn L. Hosier
79
G. E. Hohner
20
March 1, 1930
Frank L. Wurl
401
Edward M. May
300
Lynn L. Hosier
99
Dec. 10, 1931
Frank L. Wurl
317
Edward M. May
300
Lynn L. Hosier
100
Otto Peterson
83
Oct. 18, 1932
Frank L. Wurl *
250
Edward M. May
300
Lynn L. Hosier
100
Otto Peterson
150
Dec. 12, 1936
Edward M. May
300
$10 per share since 12/12/36
Through 1943
Christine G. May
(wife of E. M. May)
900
Otto Peterson
150
Previous par value not dis-
Ella Peterson
225
closed
Inez Peterson
225
(daughters of Otto
Peterson)
Lynn L. Hosier
100
Olive M. Hosier (wife
200
of Lynn L. Hosier)
V. June Hosier
50
M. Jeanne Hosier
50
(daughters of Lynn L.
Hosier)
Petitioner's *41 organizers became acquainted while employed by the Nizer Corporation of Detroit, Michigan. All three brought with them to petitioner varied experience in their respective lines of work. Such experience has been of great benefit in petitioner's development. Edward M. May, petitioner's president and general manager during 1943, began his career sometime in 1914, when he was employed by Ford Motor Company. In 1916 he entered the University of Michigan to study engineering. He remained in school approximately one year when he again took employment with Ford Motor Company. While there he became a foreman in the gear-cutting department. He later left Ford Motor Company to work for American Car & Foundry Company. He was subsequently employed, exclusive of six months service in the Army during World War I, as a tool maker with several large concerns in Detroit, including Packard Motor Company, Dodge Brothers, and Pontiac Motor Company. During this time he matriculated in a night school and in a correspondence course taking such subjects as business administration, corporate finance, factory management, employment practices and psychology. He changed jobs often because he thought the varied *42 experience would better fit him for his ambition of ultimately entering the manufacturing field. In 1921 May began work for the Chrysler Corporation as a checker and tool designer. He was later employed by Nizer Corporation in its laboratory where he did experimental work in the refrigeration field. He worked there approximately four and one-half years as the head of the tool designing department. He was later employed by Kelray Laboratory which was also engaged in refrigeration experimentation. It was while there that he had an opportunity to enter the production field for himself. He purchased from Kelray the machinery and equipment necessary for the production of refrigeration and other equipment, and later, together with Wurl and Hosier, organized petitioner corporation in 1929. Hosier, who was secretary-treasurer and sales manager of petitioner during 1943, was graduated from high school and attended business college. Prior to his association with petitioner he did purchasing work for several corporations around Detroit. Sometime during 1927 he became a sales representative on his own of forgings, castings, patterns and screw machine products. At the time of his employment by *43 petitioner he had acquired many contacts in the refrigeration trade which later proved valuable to petitioner as buyers of its products. Hosier's largest salary prior to 1929 was $450 per month which he was paid while acting as purchasing agent for Kelvinator Corporation. His income was about twice that much while he was self-employed as a sales representative. Otto Peterson, who joined petitioner in 1932 and who during 1943 was its vice-president and factory superintendent, was graduated in 1905 with a degree in marine engineering from the Naval Academy, Copenhagen, Denmark. He came to the United States in 1906 and was first employed by Ford Motor Company in Detroit. He later was employed by a number of manufacturers around Detroit and Cleveland but usually remained with each only a few months. He held responsible positions in several of these firms in the capacity of a tool designer. He met May and Hosier while employed by Nizer Corporation. They were very much impressed by his ability as a tool designer and from the organization of petitioner were desirous of bringing him into the business. Just prior to going with petitioner in 1932 Peterson was working for Russ Corporation where *44 he received compensation of $6,000 per year plus a stock bonus of 25 shares, the market value of which at the time was $20 per share but which the company was willing to repurchase for $75 per share. Wurl provided most of the financial backing in the organization of petitioner. He felt that the company would prosper more if a bonus system were established. In accordance with that idea the organizers determined that May was to receive a bonus of one-fourth of the annual net profits, which he could keep for himself or pay in part to any employee he felt deserving. Hosier, it was decided, was to receive a commission of five per cent of the gross value of petitioner's sales. In accordance with that agreement the board of directors, then composed of Wurl, May and Hosier, adopted the following resolutions: "On motion duly made and carried, Edward M. May, Vice President, was appointed to act as General Manager. His salary was fixed at the rate of $4800.00 per year and in addition a bonus fund equal to 25% of the annual net profits, is to be placed at his disposal for personal bonus and distribution among employes. The proportioning of such distribution to be determined by himself and submitted *45 to the Board of Directors for approval before payment. * * *
"On motion duly made and carried, it was agreed that a commission of 5% of the gross value of the corporation's sales would be paid to L. L. Hosier, on all orders for machine work obtained by the corporation." Petitioner's first work was the repairing of some valves for Kelvinator Corporation. This job was obtained through the efforts of Hosier. The business of petitioner immediately prospered. In 1932 May ascertained that stellite, because of its erosion and corrosion resistent characteristics, was a good material for use in household refrigerator valves. Production of this type of valve, however, was not economically feasible because of the high cost of stellite. After certain experimentation May developed a valve using the stellite material as its needle tip. May obtained a patent on the valve needle. It proved helpful in overcoming the difficulty of properly opening and shutting off of refrigerators. Until 1938 the greater portion of the profits accrued to petitioner resulted from the manufacture and sale of this stellite tip expansion valve. It also manufactured parts for valves which were purchased by other manufacturers. *46 May received no royalties on the patent because of the shop rights petitioner acquired in it. In 1938 another concern introduced a capillary tube which performed the same function as the stellite expansion valve but which cost only a few cents. The stellite expansion valve cost from 90 cents to $2 each. As a consequence, beginning in 1938, there was a marked decline in petitioner's sales. To rebuild sales, petitioner in 1938 began the manufacture of a May-designed large expansion valve, which was used in the steam heating of Pullman car compartments. In addition, petitioner began the production of an expansion valve for use in commercial refrigerators and a valve used as an oil burner control, both of which were designed and developed by May. Petitioner's customers prior to the war and purchasers of its commercial products in 1943 consisted mainly of a few large refrigerator manufacturers, some small buyers and about 100 jobbers located throughout the country who handled petitioner's valves for distribution to the service trade for use in refrigeration repair work. Petitioner's principal buyer of war products during 1943, as hereinafter more fully set forth, was an old customer, Norge *47 Division of Borg-Warner Corporation. In addition, during 1941, 1942 and 1943, it acquired many new customers who purchased certain war products from petitioner. Pertinent comparative statistical data as to sales, salaries, profits, and other features of petitioner for the years 1934 to 1943, inclusive, are as follows: Officers'
Compensation
Profits
Compensation
of May,
Wages
After
and Taxes
Peterson & Hosier
Other
Taxes
Year
Sales
Per Returns
Claimed
Allowed
Employees
Per Books
Dividends
1934
$ 351,615
$ 161,427
$ 99,338
$ 83,138
$ 49,045
1935
388,436
169,972
98,006
81,806
62,159
$ 40,000
1936
492,549
244,305
117,893
117,893
$116,447
98,692
110,000
1937
464,463
209,163
107,832
107,832
121,654
80,574
77,000
1938
172,318
52,321
50,616
50,616
46,222
-1,760
1939
259,396
87,991
63,220
63,220
80,214
21,072
1940
250,897
85,445
61,757
61,757
76,140
17,229
1941
396,653
129,591
78,258
78,252
130,844
33,617
8,800
1942
499,791 *
200,359 *
105,122
97,841
183,585
65,319
44,000
1943
696,498
314,721
135,745
97,841
215,162
66,396
44,000
$3,972,616
$1,655,295
$917,787
$840,196
$492,343
Other Employees
Tangible Assets
Including
Average
Average Weekly
Year
Surplus & Capital
Inventories
Weekly No.
Hours Worked
1934
$ 77,076
1935
93,977
1936
29,309
$ 42,623
63.3
38.3
1937
33,252
63,900
70.8
37.0
1938
31,096
42,502
28.2
32.8
1939
50,369
48,487
42.9
38.1
1940
68,099
51,247
38.2
38.6
1941
92,916
75,081
60.9
40.3
1942
114,064
73,415
60.0
46.5
1943
121,826 ** *48 102,806
63.7
49.3
The first payment of a bonus to May and Hosier was authorized soon after petitioner's organization by the board of directors on December 23, 1929, as follows: "Upon closing of the books as of November 30th a profit for the five months of $3,088.78 was shown. Based on operations to date it was estimated that profits for the six months ending December 30th would be approximately $4000.00. Therefore, in accordance with resolution adopted at the Directors Meeting of July 31st, and upon motion duly made and carried, a bonus of $1000.00 was authorized for payment to Edward M. May. At Mr. May's suggestion and with the approval of the Board $200.00 of this bonus fund was apportioned to L. L. Hosier." In 1932 when Hosier joined petitioner it was agreed that he would be paid a fixed salary and, in addition, receive a bonus of one-fourth of May's bonus of 25 per cent of petitioner's net profit. The salaries of May, Peterson and Hosier were approved by the directors for the years 1933, 1934, 1936, 1938, 1943 and 1944. In 1938 the directors of petitioner reduced the basic salaries paid to May, Peterson *49 and Hosier necessitated by the sharp reduction of sales in that year. The total compensation paid by petitioner and allowed by respondent for each of the three officers here involved for the years 1934 through 1943, inclusive, was as follows: EDWARD M. MAY
Total
Total
Compen-
Compensation
sation
Year
Basic Salary
Paid
Allowed
1934
* *50 $40,800
$55,596 $ 44,796
1935
* 40,800
48,441
37,641
1936
30,000
60,342
60,342
1937
30,000
54,082
54,082
1938
24,000
24,000
24,000
1939
24,000
30,188
30,188
1940
24,000
29,409
29,409
1941
24,000
36,320
36,320
1942
24,000
51,662
47,139
1943
24,000
68,190
** 47,139
OTTO PETERSON
1934
* 19,200
24,132
19,932
1935
** 19,200
21,147
16,947
1936
15,000
25,113
25,113
1937
15,000
23,027
23,027
1938
12,000
12,000
12,000
1939
12,000
14,063
14,063
1940
12,000
13,803
13,803
1941
12,000
16,106
16,106
1942
12,000
21,221
19,713
1943
12,000
26,730
19,713
LYNN L. HOSIER
1934
* 8,700
19,610
18,410
1935
* 8,700
28,418
27,218
1936
7,500
32,438
32,438
1937
7,500
30,723
30,723
1938
6,000
14,616
14,616
1939
6,000
18,969
18,969
1940
6,000
18,545
18,545
1941
6,000
25,832
25,832
1942
6,000
32,239
30,989
1943
6,000
40,825
** 30,989
Beginning in 1940 and through the taxable year petitioner's sales increased materially. Most of the sales in 1941, 1942 and 1943 arose out of war work, although commercial sales still constituted a substantial portion of petitioner's income. The first directly connected war work received by petitioner in 1941 called for the manufacture of a valve used in camp kitchen stoves. The valve was government designed. In 1942 petitioner was contacted by Norge Division of Borg-Warner Corporation with respect to a valve for a hydraulic gun turret. Norge approached petitioner on a problem involving such valve because it knew of its experience in the valve manufacturing field. May designed the valve in less than a month's time. He spent full time in its development, often working 14 hours a day, 7 days a week. This valve saved considerable *51 in manufacturing costs in the production of the gun turret. The gun turret for which the valve was designed was used in motor torpedo boats and also was used with certain modification on the Chevrolet armored car. Production of this valve, which was sold to Norge Division of Borg-Warner Corporation and to certain Canadian concerns, constituted $311,300 of petitioner's total war product sales of $505,888 during 1943. May also designed a hydraulic amplifier, a time-delay valve and a micro-valve for various companies, which resulted in substantial income to petitioner during 1943. May's duties increased substantially during the war. He worked overtime much of the time and took almost no time off. Hosier's work also required that he put in many extra hours during 1942 and 1943. He had little or no vacations. The commercial sales during 1943 were the result of his contracts made in previous years. In addition, Hosier solicited business sucessfully for war-work contracts from Bendix Corporation, King-Seeley Corporation, and Industrial Centerless Grinding Company. He was the one who originally obtained the Norge account for petitioner. During 1943 Hosier was charged with the job of procuring *52 material for the production of petitioner's goods. This entailed contacting government officials on numerous occasions for the purpose of getting priorities as well as completing many government forms and reports. Peterson's duties likewise grew during 1942 and 1943. In those years, as previously, he designed the tools used for the various production jobs. He was charged with the responsibility of seeing that all production in the shop was done properly and on time. In 1943, in addition to the usual hours put in during the day, because of the fact that petitioner employed three shifts, he went down to the factory at night and stayed for a few hours approximately three night a week. His work day during the year in question averaged from 10 to 14 hours. Most of the time he worked 7 days a week, only occasionally taking time out on weekends. Petitioner's respective sales of commercial products and war products during the years 1941 to 1943 were as follows: % of Sales
Sales of
of War Products
War
to Total
Years
Total Sales
Products
Sales
Commercial Sales
1941
$396,653
$ 45,367
11.4
$351,286
1942
524,791
335,525
63.9
189.266
1943
696,498
505,888
72.6
190,610 On December 31, 1943, petitioner had a backlog of unfilled *53 sales orders dating from May 1942 as follows: Manufacturing
of Refrigera-
Jobbers of
tion
Refrig-
Dates
War Products
Products
eration Products
Misc.
Total
May 12, 1942
$164,449
$41,929
$13,718
$17,787
$237,883
Jan. 1, 1943
299,946
42,569
8,686
11,934
363,135
Dec. 31, 1943
269,201
43,696
4,108
4,981
321,986
In the deficiency notice dated April 17, 1947, respondent determined in part as follows: "Deduction for officers' salaries is held to be excessive to the extent of $37,903.88, which amount has been disallowed as shown below: "Name
Allowed
Disallowed
"Edward M. May,
President
$47,139.21
$21,051.33
"Otto Peterson,
Vice-Pres.
19,712.99
7,017.19
"L. L. Hosier,
Sec.-Treas.
30,989.54
9,835.36
"Totals
$97,841.74
$37,903.88"
Reasonable allowance for salary and other compensation for personal services actually rendered to petitioner by its three officers for the year 1943 did not exceed the amount allowed by respondent. Opinion The only question presented by this proceeding is whether respondent erred in disallowing in part a deduction taken by petitioner for compensation paid to its three officers during the taxable year 1943. We believe the facts of this case show his determination to be proper. It should be noted, first, that petitioner *54 is a corporation whose stock is closely held. The three officers involved were the principal stockholders from July 1, 1929 until December 1936, after which they and their families constituted its only stockholders. In addition, the officers in question are directors of petitioner corporation. In situations of this kind courts have held that the evidence must be carefully scrutinized to determine whether the so-called compensation for services is not in reality a distribution of profits. See L. Schepp Co., 25 B.T.A. 419, 429, and cases cited. We believe the evidence here fairly discloses that the compensation paid to the officers of petitioner in the amount in excess of that allowed by respondent constituted in reality a distribution of profit. The compensation, including the basic salary and home, paid to petitioner's officers in 1943, contrary to petitioner's argument, did not result from an arm's length transaction; nor was it in accordance with a plan which it has consistently followed. It is true that in 1929 when petitioner was organized the financial backer of petitioner evolved the idea that a bonus payment plan should be established as an incentive for the officers. It was *55 agreed at that time that a bonus of 25 per cent of the net sales would be paid to May and that a bonus of 5 per cent of the gross sales would be paid to Hosier. Further, in 1932, May agreed that Peterson should receive one-fourth of his 25 per cent bonus of the net sales. Such bonus plan has been followed by petitioner during its existence and through the year in question. The basic salary paid these officers, however, has varied. In 1929 a salary of $4,800 was fixed for May. But no salary was established for Hosier at that time and apparently no basic salary was fixed for Peterson when he was employed by petitioner in 1932. The officers involved could have determined at any time after 1936, when the financial backer Wurl died and when Peterson, together with Hosier and May, constituted the board of directors, the amount of their basic salaries. Such salary paid to the officers involved in 1943 apparently was not established by them until 1938. It can not be argued, therefore, that a substantial portion of the compensation paid to the three officers by petitioner in 1943 was fixed by an arm's length transaction, or, as petitioner argues, "that the compensation which was paid to each *56 of its three officers was based upon a plan made and entered into at the first meeting of the Board of Directors in July 1929." Moreover, we believe petitioner has failed in its burden of proving that the relatively large profits petitioner accrued in 1943 were attributable to additional services rendered by these officers rather than to war conditions. Petitioner's sales of war products in 1943 constituted 72.6 per cent of its total sales. The facts show that petitioner had more orders than it could possibly fill in that year. Its backlog of unfilled orders for war products alone in 1943 amounted to $269,201. The contracts from which petitioner received the largest portion of its income did not require solicitation. A substantial amount of sales in 1943 was to customers new to petitioner in the war years. Petitioner's greatly increased sales in 1943 thus can be attributed more to the fortuitous circumstances of a war economy rather than the individual abilities of the officers involved. It is true that petitioner corporation had established by 1943 a favorable reputation in the valve manufacturing field largely through the efforts of the officers involved. This is, of course, a factor *57 in support of petitioner's argument. They were well qualified to do their particular tasks. May designed and developed the products manufactured and sold by petitioner. Hosier was its salesman and was successful in prewar years in obtaining for petitioner many valuable contracts. Peterson designed the tools used in the production end of the business and was the manager of factory operations. Petitioner makes no contention, however, that the compensation paid to its officers in previous years was inadequate; indeed, the record shows that in view of petitioner's sales record they were well rewarded for their efforts in those years. In addition, although the facts show there were several other companies engaged in the same type of work as petitioner during the year in question, there was not introduced into evidence any compensation record of such concerns for use as a basis of comparison. One of the criteria used in determining the reasonableness of compensation paid by close corporations, as the one here, is whether a similar concern or a competitor would place a like value on such services. L. Schepp Co., supra, page 430. The absence of such evidence leads us to believe that such *58 concerns would not pay the officers here involved as much as petitioner did. The compensation which petitioner paid to its officers in 1943 is 38 per cent greater than the amount paid them in 1942, taking into consideration the renegotiation of part of its profits, and 114 per cent greater than the amount which they received in 1939. Yet the duties of its officers did not increase materially over those performed in 1942. The number of employees averaged 60 in 1942 and 63.7 in 1943. The average number of hours worked by the employees in 1943 amounted to 46.5 hours and in 1943, 49.3 hours. The facts do not show that Peterson did any more work in 1942 than in 1943. Hosier was required to do little or no sales work in the year before us and the priority problems which he worked out in 1943 apparently were no more difficult in 1943 than in 1942. May was equally busy in the designing and development of special war goods in both years. In view of these facts we believe that reasonable compensation for the officers in question is in the amount as determined by respondent. We so hold. Decision will be entered for respondent. Footnotes
*. Mr. Wurl died April 6, 1936, at which time his stock was purchased by petitioner in accordance with shareholders' agreement.↩
*. These figures represent the sales and profits taxes after taking into consideration the renegotiation of $25,000 in war contracts.↩
**. This figure represents the company net worth after the deduction of $15,000 in war contracts renegotiated.
*. These figures represent the three per cent officers' base salaries as fixed by corporate action, but which were later reduced by agreement dated December 4, 1936 covering the year 1934, and by agreement dated December 9, 1936 covering the year 1935, with the Internal Revenue Agent following claimed deficiency, filing of protest, and conference to $30,000 for Mr. May, $15,000 for Mr. Peterson, and $7,500 for Mr. Hosier, or a total of $52,500.00. **. These figures represent the allowance recommended by the Revenue Agent who made the audit.↩